**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-24-00116-CV**

**IN THE INTEREST OF A.S.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 21-10-15045-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellant C.R. ("Chad") [1] appeals the trial court's order terminating his parental rights to his four-year-old daughter, A.S. ("Amy"). The trial court found, by clear and convincing evidence, that statutory grounds exist for termination of Chad's parental rights under section 161.001(b)(1)(B), (C), (D), (E), (F) and that termination of his parental rights would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(B), (C), (D), (E), (F), (2). We affirm the trial court's judgment.

---

[1] To protect the child's identity, we use pseudonyms to refer to the child, family members, and others. *See* Tex. R. App. P. 9.8(b)(2).

The First Trial and the Non-Suits

On October 29, 2021, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, Conservatorship, and for Termination seeking to terminate the parental rights of "Linda" to her two-year-old daughter, Amy, and Linda's sons, "Jerry" and "John," and also the petition sought to terminate the parental rights of Amy's alleged father, Chad, as to Amy. The Original Petition also sought to terminate "Larry's" parental rights to the fourteen-year-old twins, Jerry and John.[2]

The Affidavit in Support of Removal (the affidavit) by a Department representative filed with the Original Petition alleges that on September 18, 2021, the Department received a referral for the negligent supervision, physical abuse, and refusal to assume parental responsibility of Jerry, John, and Amy by Chad and Linda. According to the affidavit, law enforcement received a call about an assault that had occurred at a motel where Chad, Linda, and the children were living. According to the affidavit, Linda had reportedly hit one of the twins with a phone and Linda was "highly intoxicated[.]" The affidavit states that Linda did not have stable housing,

---

[2] Linda and Larry are not parties to this appeal and Amy is the only child that is the subject of the suit to terminate Chad's parental rights. The Department refiled the suit to terminate Chad's rights to Amy after the trial court had granted the Department's nonsuit of Chad from the Original Petition. We include limited details about Linda, Larry, John, and Jerry only as necessary to the resolution of Chad's appeal.

and she had moved from motel to motel. According to the affidavit, Linda drinks alcohol excessively and uses drugs, recently was kicked out of a women's shelter for using drugs, and "may also be having sex with various people in the presence of the children." In the affidavit, the affiant alleges that Chad was arrested for outstanding warrants and Linda refused to be responsible for the children and told law enforcement that CPS could come take the children. The children complained to CPS that they were hungry and that they had not eaten "in a significant period of time." According to the affidavit:

> The children are known to be hungry due to the mother passing out while under the influence of drugs/alcohol. The [two-year-old] child, [Amy], appears to be malnourished due to the mother's lack of adequate feeding. The mother has reportedly never taken the child to the doctor. The mother is known to be on drugs which includes marijuana and crack. The mother has been living in and out of different crack houses with the vulnerable aged child, [Amy]. The mother has reportedly left the child alone with people who live in these crack houses for significant periods of time. The mother was recently arrested due to being caught with crack with the father, [Chad]. The mother has used drugs in the presence of the children; and the children can reportedly corroborate the allegations.

According to the affidavit, in a September 2021 interview with fourteen-year-old Jerry, he corroborated that Linda would use marijuana, drink alcohol until intoxicated, and Linda engaged in prostitution in the motel room. The affidavit states that Jerry told CPS that Linda would send the children to the motel room next door during her prostitution encounters. The children's maternal aunt corroborated that domestic violence instances have occurred between Linda and Chad, that Linda

3

would call her and tell her about the incidents, and that after the latest incident Linda informed her that Linda feared for her life when Chad strangled her. The other fourteen-year-old, John, described Chad as a "heavy drinker" that becomes more impatient with Linda the more he drinks.

On September 27, 2021, the case was reassigned to another Department investigator due to Linda relocating from Harris County to a women's shelter in Montgomery County. Although Linda denied many of the allegations, she agreed that a safety plan should be implemented, and Linda indicated that she and the children could move in with the children's godmother. The affidavit states that according to medical records received on October 13, 2021, Jerry and Amy were seen at the UT Physician's – CARE clinic on September 29, 2021 for "Concern for Abuse or Neglect[,]" both children were diagnosed with being "at risk of lacking adequate care and protection[,]" Amy was reported to be in the 4th percentile for weight, and the medical records indicated a concern due to Linda's use of illicit drugs, physical abuse of the children, and prostitution.

According to the affidavit, on October 14, 2021, the Department received a second referral alleging that Linda physically abused and physically neglected Jerry, John, and Amy. The referral alleges that Linda reportedly beats her children and is often high on drugs, and the referral alleges once Linda threw a cup of alcohol on Amy because she was crying. The affidavit states that on October 16, 2021, the

4

children's godmother reported that she would return the children to CPS before returning them to the care of Linda. Regarding the Department's contact with Chad, the affidavit of the Department representative alleges the following:

> On October 27, 2021, I contacted the alleged father of the child, [Amy], [Chad]. [Chad] confirmed that he currently resides out of state. [Chad] stated that he is the alleged father of [Amy]; however, he is not on the birth certificate. [Chad] then stated that he is "ready to travel to Houston to submit a DNA test through CPS." I explained to [Chad] that CPS does not administer DNA tests. I informed [Chad] that the Department may be filing for legal intervention in the foreseeable future; and explained to [Chad] that he could possibly submit a DNA test through the court system. I respectfully requested [Chad] to provide me with his current address to ensure he is served accordingly. [Chad] then refused to provide me with his address; and stated that he will "go through the necessary channels" to get his daughter another way because he "doesn't feel like he needs to be talking to me." He then disconnected the phone call.

On December 30, 2021, the trial court granted the Department's motion for partial non-suit of the claims regarding one child, John, and those claims were non-suited without prejudice. The trial was scheduled for September 7, 2022, but was then reset. According to a statement in the supplemental reporter's record, the trial was first convened on September 7, 2022, and then later reconvened on October 27, 2022,[3] November 10, 2022, December 15, 2022, and January 19, 2023. In November

---

[3] The February 28, 2023 Order of Termination terminating Linda's parental rights to Amy does not include the September 7, 2022 or October 27, 2022 dates as the dates when the trial was held, but a supplemental reporter's record indicates that the trial began on September 7, 2022, and it was then continued to October 27, 2022, and a portion of the evidence was presented to the trial court.

of 2022, Chad's attorney ad litem filed documents explaining that despite the attorney's exercise of due diligence, he had been unable to locate Chad. On January 18, 2023, Chad's attorney ad litem filed a document stating that he had located Chad, and the ad litem included some contact information for Chad. On January 20, 2023, the State filed a Notice of Nonsuit as to Chad, and the trial court signed an Order granting the Department's Notice of Nonsuit without prejudice as to Chad.

On February 28, 2023, the trial court signed an Order of Termination terminating Linda's parental rights to Amy and Jerry and terminating Larry's parental rights to Jerry. The February 28, 2023 Order of Termination also appointed the Department as permanent managing conservator of Jerry and Amy.[4]

---

[4] We do not have the entire reporter's record from the termination proceedings as to Linda, but our appellate record includes a lengthy clerk's record reflecting pleadings and filings from the entire termination proceeding against Linda, as well as a copy of the termination proceedings that were refiled against Chad. In the clerk's record we also find a copy of a "Permanency Report to the Court-Permanent Managing Conservatorship" filed on March 13, 2023, that includes the following in pertinent part:

[] Current Legal Status
The Department was appointed Permanent Managing Conservator of [Jerry] and [Amy] on January 19, 2023. The father of [Jerry] relinquished his rights and mother's rights were terminated. [Amy]'s father was recently located, so his rights have not been terminated.

The report also recommends that the Department continue as Jerry's and Amy's permanent managing conservator.

New Petition, Trial, and Termination of
Chad's Parental Rights to Amy

On March 7, 2023, the Department filed a new Petition to Terminate Parental Rights, asking the trial court to terminate Chad's parental rights as to Amy. On November 3, 2023, DNA test results were filed with the court indicating that Chad is Amy's biological father. On January 19, 2024, the Department filed a First Amended Petition to Terminate Parental Rights (hereinafter "the Petition"), which was the live petition at the time the trial court terminated Chad's parental rights to Amy. The Petition alleged the following, in relevant part:

> If [Chad] appears and is established as the father, or is determined to be the presumed father, and reunification with the father cannot be achieved, the Court should terminate the parent-child relationship between [Chad] and the child [Amy] under Chapter 161, Texas Family Code, if both of the following are shown:
>
> [] [Chad] has committed any of the following acts or omissions:
>
>> [] knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(D), Texas Family Code;
>>
>> [] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code;
>>
>> [] failed to support the child in accordance with the father's ability during a period of one year ending within six months of the date of the filing of the petition, pursuant to § 161.001(b)(1)(F), Texas Family Code;

[] Voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months, pursuant to section 161.001(b)(1)(B);

[] Voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months pursuant to section 161.001(b)(1)(C);

[] Failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition pursuant to section 161.001(b)(1)(F);

[] Executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by Chapter 161, Texas Family Code, pursuant to § 161.001(b)(1)(K), Texas Family Code;

[] constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months and: (1) the Department has made reasonable efforts to return the child to the father; (2) the father has not regularly visited or maintained significant contact with the child; and (3) the father has demonstrated an inability to provide the child with a safe environment, pursuant to § 161.001(b)(1)(N), Texas Family Code;

[] failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to § 161.001(b)(1)(O), Texas Family Code;

[] and that termination of the parent-child relationship is in the child's best interest.

On January 31, 2024, and March 11, 2024, the trial court heard evidence in the Department's suit to terminate Chad's parental rights to Amy.[5]

Testimony of the Court Appointed Special Advocate (CASA)

The CASA testified that she was assigned to the case in September of 2023. The CASA testified that four-year-old Amy's current placement was with her maternal aunt, Laura, and the CASA found Laura's home appropriate for Amy. According to the CASA, Amy had been in the Department's care with the Department as either a temporary conservator or a permanent managing conservator since October of 2021. The CASA stated she had not met Chad, and to her knowledge, he had never contacted her or any person with CASA. The CASA testified she had reviewed the documents from 2021 forward and had interacted with Amy, Jerry, and John. The CASA did not believe visitation between Chad and Amy would be appropriate, and the CASA believed it was in Amy's best interest for Chad's parental rights as to Amy to be terminated. On cross-examination, the CASA testified that she had never attempted to contact Chad and she had not obtained his contact information from his attorney because when she was assigned to the case in

---

[5] We limit our further discussion of the evidence to address the issues on appeal.

September of 2023, she believed that Chad's parental rights as to Amy had already been terminated and that Amy's case was proceeding "into adoption[.]"

Testimony of the CASA Supervisor

The CASA Supervisor testified that she had been the supervisor assigned to the case since May of 2022, and she had reviewed the records in the case and completed an investigation. According to the CASA Supervisor, she attempted to contact Chad through his attorney, but her attempts failed because "[n]obody knew where [Chad] was." The CASA Supervisor testified that she believed that termination of Chad's parental rights to Amy was in Amy's best interest because he has not had a relationship with Amy. The CASA Supervisor explained that the plan for Amy was relative adoption, the supervisor believed that relative adoption was in Amy's best interest because of her close relationship with her older brothers, and Amy would be adopted with her older brothers Jerry and John, who were already living in the same home. The CASA Supervisor recalled that Amy had a bond with her brothers, her maternal aunt that she had been living with for two years, her maternal uncles, and a maternal grandfather. According to the CASA Supervisor, she had been trained in child trauma and she believed that it would be traumatic for Amy to be in Chad's care because she did not know him, and it would place her "into a world she never knew." The CASA Supervisor testified that it was in Amy's best interest for Chad's parental rights to be terminated so that Amy could be adopted

into the home where she had lived the past two years and so that she could have permanency.

On cross-examination, the CASA Supervisor testified that after Chad appeared in court when Linda's parental rights as to Amy and Jerry were terminated and this case had to be reset because Chad had been located, the CASA Supervisor attempted to contact Chad through his attorney in 2023.

Chad's Testimony

Chad testified that Amy was born on August 31, 2019. According to Chad, he primarily lives with his father in Houston, but his permanent address is his sister's house in Missouri where he often visits. Chad testified that if Amy was returned to him, they would live at his father's home in Houston. Chad testified that he never gave the address of his father's residence or Chad's new cell phone number to the Department, that he communicated with the Department primarily through e-mail and phone, and that it was easier to contact him by e-mail. According to Chad, he worked from February until August of 2023 making $21 an hour as a maintenance man at apartment complexes, he started a remodeling business with his sister in Missouri, where he had been living for a couple of months, and he is paid in cash for his work with the remodeling business. Chad testified that he has eight children. According to Chad, as for his obligations to his other children, one child is over eighteen years old, he is obligated to pay child support for one of the other children,

11

and he has "50/50 custody[]" as to the remaining children so he does not have a current child support obligation for them. Chad testified that he owns no property and the only time in the last five years he has rented property in his name was for a five-month period the prior summer.

Chad recalled that at the time of Amy's removal by the Department in 2021, he had been in a relationship with Amy's mother, Linda, for two years, and they were no longer together after the Department got involved in 2021. Chad testified that the last time he lived with Linda in a home they lived in a house that was owned by his grandmother and sold after the grandmother's death. Chad explained that when he and Linda were together, Linda would stay in different hotels with Linda's children, Chad would pay for the hotels, he often stayed at the hotels with Linda, he let Linda take care of Amy at the hotels when he was not there, and at that time Amy's brothers were not enrolled in school. Chad testified that, prior to Amy's removal by the Department, he never believed Amy was in danger when he left Amy in Linda's care.

Chad testified that at the time the Department removed Amy, she was almost two years old. According to Chad, on the night of the incident that led to the removal, he was at a hotel with Linda, Amy, Jerry, John, and one of Chad's daughters. Chad recalled that Linda intentionally hit Jerry with a phone, Chad "stopp[ed] her hands[]" from hitting Jerry, and Linda hit Chad with the phone causing a physical altercation

12

in which he bruised her and held her down while she was kicking and screaming. Chad explained that Linda threw Chad's phone in the toilet, Chad left the hotel room and had the four children wait on the stairs while he went nearby to the hotel manager's office to call the police, and the children were back inside the locked hotel room with Linda when Chad returned to the hotel room. According to Chad, he called the police, they responded and tried to get Linda to open the door. Chad said the police ultimately took Chad to jail for a couple of days for an outstanding warrant for a speeding ticket and a "seat belt ticket[,]" and CPS was notified of the incident. Chad recalled that when he got out of jail, he was still paying for a room at the hotel, and he came back to the hotel. Chad testified that Amy was still with Linda at the hotel, and he was told that "CPS was coming to get them[,] and they were leaving."

According to Chad, the Department initially placed Amy with Linda's friend and let Linda stay at the friend's house for the first six months that Amy was in the Department's custody. Chad testified that he supported Amy by sending her items he purchased through Amazon, and Chad said he also sent money to Linda, but he agreed he did not have any bank statements to show that he provided any support for Amy while the Department had custody of her. Chad recalled that after that six-month period that Amy was placed with Linda's friend, Amy was then placed in a foster home. According to Chad, he tried to contact the caseworker, but the caseworker never called him back. Chad testified that when Amy was removed in

13

2021, he was in contact with someone in the Department named "Pansey," but he could not remember her last name. Chad said he told the Department where he lived, the Department did not serve him until March of 2023, and he was not DNA tested until November of 2023. According to Chad, he did not appear at the earlier court proceedings because the caseworker advised him not to come, the caseworker did not give Chad "the information for the court[,]" and Chad did not know how to get that information. Chad agreed that he went to court for his other children, but he testified that he did not go to the earlier proceedings regarding Amy because he was waiting to hear from the Department's caseworker. Chad agreed that other than the 2021 incident, he had also been investigated by CPS before as to his other children, but he testified those investigations "never went that far." Chad recalled that he had other CPS history and investigations including CPS history in Missouri, and when asked if he had been investigated by CPS numerous times he responded, "I actually have no idea." Chad testified that his rights have never been terminated to any of his eight children and that he never had a child removed from his care in Missouri.

According to Chad, the Department never offered him a service plan and the Department made no effort to place Amy with him during the pendency of the case. Chad testified that he did not want the court to terminate his rights and that if the Department would have offered services, he would have completed them. According to Chad, he talked to Amy over the past year through Snapchat with her brothers and

they would send pictures, but that when Linda's sister found out Chad was in contact with Amy and her brothers the sister "kind of stopped it." Chad recalled that, as of the time of trial, he had not been in contact with Amy for over three months. Chad testified that he believed that visitation with Amy would be appropriate because he is "her father and for the first two and a half [years] until CPS took her, [he] was always there." Chad recalled that prior to Amy coming into the Department's care, his other children got along well with Amy and Amy loves Chad's parents. According to Chad, he could financially support Amy if his rights were not terminated despite only earning $1,100 in one of the five months prior to trial and even though he did not have any income in the other four months from his new business in Missouri. Chad testified that he was not paying rent to his father; he relied on food stamps and his family for food; and, he did extra odd jobs when he needed money.

Chad denied ever doing drugs with Linda, and he denied that he had used drugs in front of the children, but he admitted that he used marijuana during the time Amy was born and that he used marijuana until she went into CPS custody in 2021. As to whether Linda used drugs, Chad testified, "I can't say to that." Chad testified he last used marijuana prior to February of 2023, and he claims he has not used any other illegal substances. According to Chad, Linda suffers from bipolar disorder and at one point she had been medicated for that diagnosis. He testified that Linda would

15

get angry as a symptom of her bipolar disorder and that he does not know if she had been taking any medication for bipolar disorder before Amy's removal. Chad recalled that there were "a few" instances of domestic violence with Linda when they were together, but he stated that prior to Amy's removal Linda had never gone "out of control" with the children but had gotten out of control with Chad in front of the children. Chad testified that although he and Linda fought in front of the children, the only time it turned physical in front of the children was when Amy was removed by the Department in 2021. Chad admitted that in the past Linda had been violent towards him and he had been violent towards her, and that he had caused her to bruise, but he could not recall how many times he bruised her and said it was "not that many[]" times. According to Chad, his violence towards Linda caused her to bruise during the 2021 incident, and he agreed the police were called in 2021 and on other occasions because of the violence between Linda and Chad. Chad testified he still sees Linda on a regular basis; he last talked to Linda two weeks before trial and, although he denied that they were still in a dating relationship, he did not know "right now" if he would have a physical relationship with Linda in the future. Chad testified that if Amy came back into his care, he would not initially let Amy see Linda but eventually "would not have a problem[]" with Amy seeing Linda.

16

Testimony of the Department Caseworker

A Department Caseworker testified that she was assigned the case in 2022, after Amy was placed with her current placement in her maternal grandmother's home with Amy's brothers, Jerry and John. According to the Caseworker, Linda's parental rights as to Amy were terminated earlier in 2023, and the Department's goal for the case was termination of Chad's parental rights as to Amy. The Caseworker recalled that prior to first seeing Chad at court in 2023, the Department performed a diligent search for Chad, but the Department was unsuccessful in contacting Chad by phone. The Caseworker testified that once she got in contact with Chad after he was served, he provided the Department his father's address as the address where he was living and provided his mother's and father's phone numbers. According to the Caseworker, the phone number that he gave her that was his was not working when she tried to call, the last time she tried the number in December of 2023 it was not working, and Chad informed her that the phone was disconnected. The Caseworker testified that her primary method for contacting Chad was by e-mail. The Caseworker testified that to her knowledge Chad only asked to visit Amy in October and November of 2023, months after he had been served, but the Department was not going to establish visitation because it was moving forward with termination. The Caseworker testified that Amy's current placement was appropriate, and Amy was doing well in that placement.

Testimony of the Department Representative

A Department Representative in another case regarding one of Chad's other children testified that in February of 2024 she had an intake related to one of Chad's other children. The Department Representative testified she spoke with the child and the child's paternal grandmother. According to the Department Representative, she was unable to reach Chad the entire time she was investigating the other case, and the child went to live at a safe place with the paternal grandmother. According to the Department Representative that case was closed.

Testimony of the Department's Conservatorship Caseworker

The Department's Conservatorship Caseworker for Amy's case until 2022 testified that she developed a family plan for Chad, but she was never able to establish contact with him through the phone numbers they obtained after a diligent search. According to the Conservatorship Caseworker, she worked with Linda on her services, and the Department's primary concerns for Linda were substance abuse, domestic violence, and mental health. The Department developed a family plan for Linda with services to address the Department's concerns. Linda did not complete any of the plans, and the Department's concerns with Linda were unresolved. Linda's parental rights as to Amy were terminated, and the Conservatorship Caseworker testified she would have concerns with Amy being around Linda. When the Conservatorship Caseworker was asked if Chad was still

having contact with Linda on a regular basis would the Conservatorship Caseworker have concerns, she responded, "Yes." On cross-examination, the Conservatorship Caseworker testified that she had not attempted to contact Chad since March of 2023.

Jerry's Testimony

Sixteen-year-old Jerry testified he remembers what happened when the children were removed by CPS in this case. According to Jerry, in the months leading up to the removal, he lived with his mother (Linda), Amy, John, and Chad at three or four different motels. Jerry recalled that he was not in school during those months, and during the day Chad would take him to go help him work for most of the day. Jerry testified that Linda always wanted "to be with [Chad] . . . over her kids[.]" According to Jerry, Chad abused Linda and "belittled her." Jerry testified that on one occasion he saw Chad physically abuse Linda in the motel room when Jerry, John, and Amy were watching, and Linda was bleeding as a result of the abuse by Chad. Jerry also recalled that he saw Linda and Chad smoke drugs daily during that three-month period before CPS removed the children. Jerry testified that his mother's behavior was "crazy[]" during those three months, and at the time of this trial, he had concerns about her mental health. According to Jerry, when he and John would leave during the day and help Chad work, Jerry was concerned about Amy

19

staying back with Linda at the motel because Amy was so young and Linda "barely [could] take care of herself[.]"

Jerry testified that he was living at his maternal aunt's house with Amy and John, and Jerry and Amy were in the process of being adopted by their aunt. Jerry believed that Amy being adopted by their aunt was in Amy's best interest because all her needs were being met and he and Amy have a stable environment living with their aunt. Jerry testified that if Chad testified that he never did drugs with Linda and that he never saw Linda do drugs that "[t]hat would be a complete lie." Jerry also testified that Chad has not had contact with Amy while Amy has been at her aunt's and that Jerry had not seen Chad send any money or gifts to Amy at her aunt's house or at the first placement prior to them being placed with their aunt. Jerry recalled that on the occasion where he saw physical violence between Chad and his mother that caused his mother to bleed, his mother had thrown a phone at one of the children, and Chad tried to stop her. According to Jerry, Chad still left Amy with Linda after that event, and Jerry believed it was dangerous for Amy. Jerry testified that Chad should have had concerns about Linda's mental health during those months at the motel, but that Chad still left Amy with Linda while Chad and the boys worked. According to Jerry, Linda would physically abuse Jerry and John, and although Jerry never personally saw Linda physically abuse Amy, he still worried about it. Jerry

20

recalled that he had concerns that Linda neglected Amy, and that the entire family at times during those three months would only have one meal a day.

Laura's Testimony

Laura, Amy's aunt, testified that she has had Amy in her home since May of 2022 and that Amy is doing well. According to Laura, she has not had contact with Chad since Amy was placed in Laura's home, and she has not received any financial support from Chad for Amy's care. Laura testified that Chad and Linda stayed with Laura for a week in 2021 prior to Amy coming to live with Laura, and that was the only time Laura had been around Chad. According to Laura, during that time Laura had concerns about Linda's drug use. Laura testified that she had not been in contact with Linda since the first court hearing and that Laura had concerns about Linda's mental health at that time. Laura testified that she did not know if Chad and Linda were still together.

After the bench trial, on March 26, 2024, the trial court signed a final order terminating Chad's parental rights to Amy and granting the Department's request to modify the order signed on February 28, 2023. The trial court found that the Department had shown, by clear and convincing evidence, that it was in Amy's best interest to terminate Chad's parental rights. The trial court found that the Department had shown by clear and convincing evidence grounds for termination of Chad's parental rights under section 161.001(b)(1)(B), (C), (D), (E), and (F). The trial court

21

found that Chad had knowingly placed or knowingly allowed Amy to remain in conditions or surroundings which endangered her physical or emotional well-being; he had engaged in conduct or knowingly placed Amy with persons who engaged in conduct which endangered Amy's physical or emotional well-being; he voluntarily left Amy alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support for Amy, and remained away for a period of at least three months; he voluntarily left Amy alone or in the possession of another without providing adequate support of Amy and remained away for a period of at least six months; and Chad failed to support Amy in accordance with Chad's ability during a period of one year ending within six months of the date of the filing of the petition. Chad timely appealed.

Issues on Appeal

In issue one, Chad argues that the trial court denied Chad's due process rights by terminating his parental rights as to Amy on two statutory grounds that he alleges were neither pled nor tried by consent. In his second issue, he argues that the trial court lost jurisdiction over him and the case terminating his parental rights when his trial commenced twenty-seven months after the trial court granted the Department temporary managing conservatorship of Amy. In issue three, Chad challenges the legal and factual sufficiency of the evidence supporting the trial court's termination based on subsections B, C, D, E, and F of section 161.001(b)(1) of the Texas Family

22

Code. In his fourth issue, Chad argues that the Department violated his constitutional rights by not serving him when the Department knew his phone number and whereabouts but served an out-of-state relative, no service plan was created or visits set up, no reasonable efforts were made to return Amy to Chad's care, the CASA failed to follow procedures, Chad's rights were terminated before he was ever legally served, his trial commenced twenty-seven months after removal, and termination was based on "grounds not pled for."

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that the termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex.

23

2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.). We defer to the factfinder's credibility determinations as long as they are not unreasonable. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

Jurisdiction

We address Chad's second issue first, because this issue raises a jurisdictional argument. In Chad's second issue, he argues the trial court lost jurisdiction by failing to begin Chad's trial within the deadlines prescribed in section 263.401 of the Texas Family Code. In *In re E.E.*, 678 S.W.3d 370, 372-73 (Tex. App.—Amarillo 2023, pet. denied), the Amarillo Court of Appeals addressed a similar issue and explained that

> Section 263.401 pronounces the time within which a termination must be commenced when "the date the court rendered a temporary order appointing the department as *temporary managing conservator*. . . ." Tex. Fam. Code Ann. § 263.401(a) (emphasis added). It says nothing of a situation where the Department holds the position of a permanent managing conservator. Nor did father cite us to any authority applying the time period mentioned in that statute to a permanent managing conservator. Our duty being to apply statutes as written, *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 387 (Tex. 2016), means we must read § 263.401 as excluding circumstances where the Department acts as the child's permanent managing conservator. Thus, the several year delay between appointment of the Department as [the child's] permanent managing conservator and termination of father's parental rights did not result in the trial court losing jurisdiction to act.

Here, the clerk's record indicates that the Department had previously been appointed Amy's permanent managing conservator when Linda's rights were terminated as to Amy. That permanent appointment occurred prior to the filing of the new Petition to Terminate. Chad was nonsuited from the first case that terminated Linda's parental rights to Amy. In the new Petition, which was filed to terminate Chad's parental rights, the trial court had a separate trial and entered a separate order

25

of termination of Chad's parental rights to Amy. The reporter's record shows that at the time the trial court terminated Chad's parental rights to Amy on March 11, 2024, the trial court reiterated that the Department "is already the permanent managing conservator of [Amy]." Chad does not cite to any authority that the deadline in section 263.401 applies when the Department is already named as the permanent conservator of the child. We conclude that section 263.401's deadline is inapplicable here. *See In re E.E.*, 678 S.W.3d at 372. We overrule issue two.

Statutory Grounds D and E

We next address Chad's third issue on appeal. In issue three, Chad challenges the legal and factual sufficiency of the evidence supporting the trial court's termination based on subsections B, C, D, E, and F of section 161.001(b)(1) of the Texas Family Code. We are required to consider the sufficiency of the evidence pursuant to sections 161.001(b)(1)(D) or (E) if challenged. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one predicate ground for termination in addition to the best interest finding is all that is necessary to affirm a termination judgment. *Id.* at 232-33. Because evidence of statutory grounds D and E may be interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020,

pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

As to subsections D and E, Chad argues on appeal that the only evidence of endangerment was provided by the CASA worker, the Department supervisor, and Amy's sibling, Jerry. According to Chad, the CASA worker and the Department supervisor "failed to do their job in this case" and neither had any actual knowledge of Chad "allowing [Amy] to remain in any condition." Chad argues that Jerry's testimony about Linda's endangering behavior was "that she wanted to be with" Chad. Chad contends Jerry denied that Linda was physically violent with Amy, and the testimony about the children being hungry or underfed first surfaced at trial and those allegations were not supported by the initial removal affidavit or other testimony at trial.

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who

engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d at 360). "'[E]ndanger' means to expose to loss or injury[.]" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered

28

when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Abusive or violent conduct by a parent may produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "'Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child.'" *In re M.S.*, 662 S.W.3d 620, 630 (Tex. App.—Beaumont 2023, pet. denied) (quoting *In re K.A.R.*, No. 04-17-00723-CV, 2018 Tex. App. LEXIS 2548, at *9 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.)). This Court has stated that a parent's pattern of drug abuse supports a finding of endangerment even if there is no evidence that such drug use actually injured the child. *See In re T.B.*, No. 09-20-00172-CV, 2020 Tex. App. LEXIS 8938, at *26 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)); *In re A.M.*, No. 09-19-00075-CV, 2019 Tex. App. LEXIS 7941, at *55 (Tex. App.—

29

Beaumont Aug. 29, 2019, pet. denied) (mem. op.). The Amarillo Court of Appeals has also explained that "courts have consistently found that a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in [subsection] E." *In re T.C.*, Nos. 07-18-00232-CV & 07-18-00233-CV, 2018 Tex. App. LEXIS 6768, at *8 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.).

A pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez*, 190 S.W.3d at 196. A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family &*

*Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]").

The trial court heard Jerry testify that in the months leading up to the children's removal, he and Amy and the other children lived with Linda and Chad at various motels, that Chad was abusive to Linda, that he saw Linda and Chad use illegal drugs daily, that Chad left Amy in Linda's care even though Linda's behavior was "crazy" and she could barely care for herself, that Jerry had concerns about Linda's mental health and worried about whether she would physically abuse Amy because she had physically abused Jerry and John, and that the children were often hungry and did not have enough to eat. The trial court heard Chad's testimony where he admitted that he smoked marijuana from the time of Amy's birth until she went into CPS custody in 2021 and that he had last used marijuana in February of 2023. Chad testified that he was aware of Linda's bipolar disorder diagnosis, but he stated he was not aware if she was taking medication for it, and Chad agreed that Linda's bipolar disorder made her angry. Chad admitted that he and Linda had instances of domestic violence between them when they were together, and he agreed the police had been called on multiple occasions because of the violence between them, that Linda had "lost control" with Chad in front of the children, that Chad allowed Amy

to stay with Linda at the various hotels when he was not there, that he and Linda had a physical altercation on the night of the removal after Linda hit John with a phone, that he left the four children outside of the hotel room while he went to the manager's office after that altercation, but when he returned to the room the children were locked up in the hotel room with Linda, and that he has continued to see Linda on a regular basis and could not rule out having a physical relationship with Linda in the future or letting Amy eventually see Linda if Amy came back into Chad's care. The trial court also heard Chad's testimony that in recent months he had earned no income, that he was living in Missouri and Texas and relied on family for a place to live and relied on food stamps and family for food. The trial court could have disbelieved Chad's testimony that he never used drugs in front of the children, and the trial court could have disbelieved that Chad did not know whether Linda used drugs. *See In re J.P.B.*, 180 S.W.3d at 573.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Chad, through his individual acts or omission or a course of conduct endangered Amy's physical or emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 344-45. We conclude that the Department established, by clear and convincing evidence, that Chad committed the predicate acts enumerated in subsections D and E. *See* Tex.

32

Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence that the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Chad endangered Amy. *See In re J.F.C.*, 96 S.W.3d at 266.

We need not address the sufficiency of the evidence to support a violation of the other subsections of section 161.001 cited in the trial court's Order of Termination. *See In re N.G.*, 577 S.W.3d at 232-33. We overrule issue three.

## Statutory Grounds B and C

In issue one, Chad argues that the trial court's termination order was based in part on findings under subsections B and C, which were neither pled by the Department nor tried by consent. We specifically note that both subsections were included as a basis for termination in the First Amended Petition to Terminate Parental Rights pertaining to Chad. Additionally, having concluded that the evidence is legally and factually sufficient to support the trial court's findings of endangerment under subsections D and E, we need not address issue one. *See id.*; *see also* Tex. R. App. P. 47.1. We overrule issue one.

## Constitutional Argument

In issue four, Chad argues that his constitutional rights were violated because the Department failed to use any real effort during the case to locate him, because

the Department "portray[ed] ignorance of his whereabouts[]" despite having his phone number at the time of Amy's removal, because no service plan was ever created for Chad and Amy, no visits were ever set up despite the fact he says he made a request for visits, and because the Department made no reasonable efforts to return Amy to Chad's care. Chad also complains that CASA did not follow their own procedures, trial commenced twenty-seven months after Amy's initial removal, and his rights were terminated on grounds that were not included in the pleadings.

Generally, to preserve error for appellate review, a party must present the complaint to the trial court by a timely request, objection, or motion, stating the specific grounds for the complaint, and obtain a ruling. Tex. R. App. P. 33.1. The rules governing error preservation apply to civil cases involving termination of parental rights. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 350-51 (Tex. 2003) (fundamental-error doctrine does not apply to procedural preservation rules, nor does due process require appellate review of unpreserved complaints in parental rights termination cases); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (failure to assert a constitutional claim in the trial court bars appellate review of claim). We have already overruled Chad's issue on appeal making a jurisdictional argument and his issue on appeal about statutory grounds B and C wherein he argues those grounds were not pled or tried by consent. Chad did not raise in the trial court any of the other

34

alleged constitutional violations or complaints he states on appeal. Accordingly, those complaints are not preserved for appellate review. *See In re K.A.F.*, 160 S.W.3d at 928; *In re B.L.D.*, 113 S.W.3d at 350-51; *see also* Tex. R. App. P. 33.1. We overrule issue four.

Having overruled Appellant's issues on appeal,[6] we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on June 27, 2024
Opinion Delivered September 19, 2024

Before Johnson, Wright and Chambers, JJ.

---

[6] On appeal, Chad does not challenge the trial court's best interest finding.